20-2115, Hanwha Q CELLS v. ITC. Mr. Pack, please proceed. Good morning, Your Honors. May it please the Court, Sean Pack for the appellants. The key issue on appeal today is whether the International Trade Commission erred in its claim construction of the terms related to silicon substrate. If so, the ITC's summary determination of non-infringement must be vacated, and that can be done without reaching either the second claim construction issues relating to the interposed between terms or the alleged prosecution history disclaimer. The principal error in the Commission's claim constructions is that they exclude all disclosed embodiments of the ways in which the dielectric layers are deposited to create passivation effect. And that's because they ignore all of the intrinsic record evidence showing that oxidation of silicon material in the substrate, or basically rusting of that silicon substrate, occurs no matter what steps are taken, including the optional step of cleaning the surface. Like an exposed iron surface, Your Honors, silicon rust will form because pure silicon is highly reactive to oxygen. So whether you have the wafers being processed, being exposed to oxygen, or through the deposition processes themselves, which involve different forms of oxygen sources, you will have the rusting of silicon material forming silicon oxide. And that is true in each of the disclosed embodiments, including JUNG, which is Appendix 9385, which talks about a silicon oxide substrate, or in the Ritala reference at Appendix 8893, which talks about the easy formation of silicon oxide using these oxygen sources, as well as the... Mr. Pack? Thank you. Just so I understand your claim construction argument, are you saying that a silicon substrate inherently always has a silicon oxide layer laying on top of it, such that that layer of silicon oxide is the actual surface of the silicon substrate? Your Honor, so what the ALJ found is that silicon substrate, as understood by the RISC-LPR, points to impurities and dolphins. Mr. Pack? Yes? I just need your answer to that question. Is that your understanding, is that your conception of the claim term, silicon substrate, and surface of a silicon substrate? Your Honor, in the disclosed embodiments that involve oxygen sources, all of them involve oxygen sources. Is it yes or no? I'm sorry, Mr. Pack, is it yes or no? Let me repeat the question. Is it your conception of a silicon substrate that inherently it always has a layer of silicon oxide sitting on top, such that it's actually the silicon oxide layer itself that is the surface of a silicon substrate? Yes, in the silicon substrate at issue in this case, that is our position. That's your position. Okay. I thought your side in prosecution history worked long and hard to distinguish away prior art references that in fact had a silicon oxide layer sitting on top of their substrate. No, Your Honor. I think that we, if you look at the prosecution history, and we'll take you to that, Your Honor, appendix. For example, looking at the amendments relating to the Agostinelli reference, Your Honor, this is 1036, or 136 to 137. All of the prosecution history arguments were about the relative sequencing of the layers and the thickness of the layers. It was not about whether the substrate itself has any type of impurity at the surface. Even the commission's findings did not find that there was any prosecution history disclaimer on the presence of silicon oxide at the surface of the substrate. What about distinguishing Schmidt? Same thing, Your Honor. It was talking specifically about older thick layers of silicon dioxide that is grown as a passivation layer, but it was not mentioning whatsoever the presence of impurities such as silicon oxide as part of the substrate. Just so I understand it, your theory of your claim, even if we understand your claim to require and demand a layer of aluminum oxide to be applied directly on top of the surface of the substrate, nevertheless, if there is a layer of silicon oxide at the surface of the substrate, underneath that aluminum oxide layer, that still infringes the claim? That's right, Your Honor. Obviously, we disagree with the first point about the directly language which is not present in the claims, but Your Honor's understanding is exactly right. We believe that silicon substrate... Therefore, any product that has a silicon substrate with an order of layers that's silicon oxide, aluminum oxide, and maybe silicon nitride, that would infringe your patent. No, Your Honor. Our position is that silicon oxide, the specific form of silicon oxide called interfacial oxide is formed as part of the silicon substrate, which can include impurities. Obviously, the claim language talks about deposition of additional dielectric layers on top of the substrate, but our position is that the silicon substrate itself can and must include impurities at the surface based on the disclosures. Mr. Pax, this is Judge Lin. As I understand it, you're arguing that silicon comes with a layer inherently. That's right, Your Honor. We see that in the ALJ's construction, that silicon substrate includes impurities as well as dopants.  The fact that the cell should have two layers on top of this silicon really means three layers because silicon comes with a layer. That's right, Your Honor. That's exactly what all the intrinsic records show, is that in every disclosed embodiment, you have a silicon oxide as an interfacial material impurity at the surface of the substrate itself. That includes retala, Xiong, and OX. Isn't there a distinction between impurities that may exist and a layer, which to me suggests something deliberate? I just find your argument a stretch at best. Your Honor, I think it's clear in the 215 patent that silicon oxide is described as a contamination. A contamination is exactly the type of impurity that would be formed as part of the oxygen-based deposition process here. Yes, and it seems to me that a contamination is different from a layer, which in my way of thinking suggests something deliberate that is put in place to have some sort of effect. In fact, the specification does suggest in a few places that you, in the process of making this multi-layer structure, you should start with the silicon substrate and clean it, which again is consistent with the notion that whatever silicon oxide might exist is an impurity or a contaminant that could be washed off before the deliberate layers are put in place. But it seems to me, and correct me if I'm wrong, that you're arguing that no, the silicon in every case comes with a layer, and clean or not, it comes with a layer and always comes with a layer. Yes, Your Honor, what we're saying is the following. Even if you were to take the optional step of cleansing the silicon oxide that is formed as part of the substrate, all of the references cited in the patent teach that silicon oxide will grow back because the deposition processes involve using oxygen sources that will re-expose the surface to oxygen. So our most active, Your Honor, is that you will have silicon oxide in the final structure. It grows back in the time that it takes to take the substrate from the cleansing station to the layer application station? That and also, Your Honor, more specifically, all of the embodiments for depositing the first dielectric layer, which is the aluminum oxide, involve using sources of oxygen in the deposition process. So even after you cleanse it, and this is shown in HOAX as well as in RITALA, you will have the growth of that silicon dioxide layer because the silicon is again exposed to oxygen as part of the deposition. Is there expert testimony to that effect in the record? Your Honor, I don't believe that any of the parties here cited to extrinsic evidence, but this is all cited in the intrinsic record, and I can give Your Honor the sites, which is HOAX at 9370 and 9371. It says that specifically it was verified that the oxide layer formed during the O2 plasma exposure itself does not yield any surface saturation, and that is at the second column of Appendix 9371. Counsel, this is just more, you cited RITALA, but RITALA doesn't show any silicon oxide layer. If we look, for example, at Figure 1, it shows a silicon substrate and an aluminum oxide film, and it shows no silicon oxide layer. Actually, Your Honor, if you turn to Appendix 9366, it specifically states that even in the chemical process, which uses metal forms of oxygen sources, quote, even if the interface does have oxidized silicon, only one monolayer thick, and thus represents an atomic-level interface between Al2O3 and silicon, which is oxidized only from its topmost layer. So even in the chemical process used in RITALA, you will have a silicon dioxide layer or impurity that is formed as part of the deposition process. And it is also shown, Your Honor, in Figure 1, if you see that white line that is separating the two films, that is the silicon dioxide. All right. Counsel, do you want to save the rest of your time for rebuttal? Counsel? Counsel? Mike, are you still on the call? Mr. Pack? Yes. Yes, Your Honor. I am reserving the rest of my time. Thank you. Okay. And let's hear from opposing counsel, please. Mr. Pack. Thank you. Thank you. Good morning. May it please the Court. Just to address the points made by appellant's counsel, I believe if the Court agrees that if any of the disputed claim constructions at issue, any of the terms at issue, agrees that prosecution has to disclaim or apply to any one of these terms, you can affirm the Commission's determination here. If you agree to that prosecution disclaimer that the patentee here is simply limited to claim solar cells, anything but the specific two-layer dielectric stack and disclaim inter-eating being layer between the silicon substrate and the first dielectric layer of aluminum oxide, particularly near silicon oxides. Just addressing the points raised, there is no support here that all embodiments are excluded by the claim construction rather you have... Counsel, can you just focus on the argument that Mr. Pack spent his whole period of focusing on, please, which is that I didn't even hear him say it doesn't have to be directly. I think that at least for purposes of his argument, he didn't focus on that at all. He focused on the idea that the silicon substrate automatically includes a silicon dioxide cover on it and that is part of the silicon substrate. So I think his argument is they're still in the two-layer zone because layer one is a silicon substrate which automatically has a little bit of silicon dioxide on it, which is part of the silicon substrate. So I don't think he spent his argument saying it's okay to have three layers instead of two. I think he spent his argument saying silicon dioxide is still part of a two-layer process. Thank you for the clarification. That is simply not supported by the prostitution history. The prostitution history repeatedly, consistently in detail disclaims this native silicon oxide layer. On page 14 of our brief, we explained that this native silicon oxide layer is considered this oxidation impurity that occurs on the layer of the silicon substrate. This was simply disclaimed throughout the prostitution history, particularly in the pages 136 to 137. The patent here went into great detail about these native silicon oxides. It's well known in the art for more than 20 years to have native silicon oxide followed by silicon nitride. It repeatedly stated this was not their invention, that they just caught away from the invention. The clean solar cell goes away from all these advantageous properties of using native silicon oxide. Do you have a particular quote from the JA? You said 136, 137? It's particularly at appendix page 136. It specifically states, it is well known in the art that native silicon oxides may provide for very good surface... Are you on the page? Yeah, I'm on appendix page 136. Right, where? It's right in the middle paragraph there. It specifically states, the second sentence of the middle paragraph, it is well known in the art that native silicon oxides may provide for very good surface passivation characteristics. And that surface passivation characteristics of the silicon oxide layer may be improved and stabilized by additionally depositing the silicon nitride layer on top of the silicon oxide layer. Such double layer stacks have been applied to solar cells for more than 20 years. So they considered that a double layer stack. They counted it as a layer. And they repeatedly stated this was not their invention. Rather, further on, on appendix page 137, they state, unquote, one skill in the art, we have no rationale to transfer of knowledge about the effects of silicon oxide. Oxide should be thin in order to reduce negative effects of filter effect passivation to aluminum oxides. Clearly, they state, and this is repeated throughout the history, that it is well known to use silicon oxide, native silicon oxide, as an intervening layer, but this is not their invention. And they repeat this. Would it be your view that throughout the entire prosecution, they always refer to the silicon oxide as a layer and they never refer to it as the silicon substrate? Correct. They always refer to it as a layer. They always refer to it as something that's well known in the art and that they're going this is not their claim invention. It was well known for more than 20 years. Also, that appendix page is 9870 to 9871. They clearly acknowledge that, first of all, any skill in the art, this is a very precise art in this manufacturing process for the solar cell. And one of skill in the art, understand every compound, every element, every combination of the processing step is critical. We cannot randomly substitute process steps for one another. So one of our skill in the art, reading the prosecution history, the Kendrick record as a whole would understand that you cannot simply substitute one for another and critically understand there has to be this direct interface between the silicon substrate and the aluminum oxide. Again, they repeat this repeatedly throughout the prosecution history. Again, this is in their response to the sixth office action here at 136, 137. This exact language is repeated at 105.41 and 105.42 in the request for an interview following the seventh office action and also repeated in their PTAB appeal brief at 106.65, 106.66 in their PTAB appeal brief. It's the exact same language, disclaiming, intervening in the silicon oxide and rather they replaced it with the aluminum oxide. I guess further addressing their points about retaliation, again, the prosecution history record here as I stated, this is a very precise art. It states in the specification as well at appendix page 227 lines 11 through 16 that it's all about correct selection of processing parameters and retaliation does have embodiment that does not include any silicon oxide as an intervening layer. Also, regarding the all embodiment point, this has been contradicted strongly by the sole figure. It does not show any intervening layer of native silicon oxide. And again, the spec goes into great detail regarding the chemical reaction that occurs as this critical interface between the silicon substrate and the first dielectric layer of aluminum oxide. Also, many of these points regarding impurities are moved here because of the appendix page 65 that is understood on the record and the judge ruled that all accused products here have an intentional layer, intervening layer between the silicon substrate and the first dielectric layer of aluminum oxide. Are there any further questions of the court? Hearing none, why don't we hear from Mr. Horowitz. Mr. Horowitz, do you have anything that you need to add to what Mr. Jaradine just argued? Briefly, Your Honor, and just so you know, REC has yielded its time because the REC specific issues haven't come up. I just want to follow up on a question that Judge Lynn asked, which is, isn't there a distinction between an impurity and a deliberate layer? And as Mr. Jaradine just pointed the court to, there is. The ALJ in this case found specifically that there were intentional layers of silicon oxide added between the silicon substrate and the first dielectric layer of aluminum oxide in all of the accused products. And it's important to remember, this was once a factual dispute. We have the record sites for that in footnote 2 at page 26 of the Green Brief. There was a time when Hanwha argued that there was a fact dispute as to whether the material in question was an impurity or an interfacial oxide on the one hand, or instead an intervening layer, as we argued, on the other. They gave up that dispute, that factual dispute, to streamline their path to appeal. So as the case comes to this court, there is no question. We have an intentionally applied layer of dielectric material that functions the same way as it functioned in the prior art, providing passivation to the silicon substrate. It's a separate intentional layer of material. So if that's the only issue that Mr. Pock would like to argue today, the court doesn't actually have to resolve any claim construction question, because the fact dispute was resolved by waiver in our favor below. Now... Mr. Horowitz? Yes. Does intent matter? I don't think it should, although there was a specific finding on the point. I guess it matters only insofar as if you think of the word impurity, which wasn't something that was sort of disputed below, you might think of impurity as something that's there, but you don't mean it to be there. So maybe if it's unintentional, that's a way to figure out whether it's an impurity. So to the extent that that's a way you think about impurity here, it's not an accident. It's not accidentally there. It's intentionally there. It's grown. And, you know, they say it comes with the silicon. Mr. Pock says that. And they say it's a contamination. But the 215 patent says if you've got that contamination, you can clean it off to achieve that key interface between the silicon of the silicon substrate and the aluminum oxide. And then Mr. Pock says that it excludes all embodiments of the invention. Well, with respect to the embodiment, the only solar cell that's actually depicted is in Figure 1, and there's no intervening layer of silicon material there. And then with respect to the methods, first you've got Rotala that was mentioned. Rotala is all about excluding a silicon oxide layer. That's the point of Rotala. It's right there in the abstract. And it's true that Rotala can't categorically exclude the possibility that there's a single monolayer thick indistinguishable oxidized silicon at the interface. Maybe. That's an impurity. But we have an intentional layer, and that's different. And with respect to Hooks 2006, which Mr. Pock mentioned during argument, that isn't even a disclosed embodiment. Recall that that reference isn't cited anywhere in the specification of this patent. It's only in the intrinsic record by virtue of the fact that Hanwha dumped it on the patent examiner during prosecution. There is certainly no principle of law that tells you that claims must be interpreted to encompass every embodiment of anything in an IDF ever submitted by an applicant. The embodiments in the specification teach you that you can avoid the silicon oxide layer, and that is precisely what these inventors claimed. And frankly, Jung, which was also mentioned, Jung says you can put aluminum oxide on either a silicon substrate or silicon oxide, which tells you there's a difference. And the difference is here we have that intentional layer of silicon oxide, which is precisely what the applicants repeatedly disclaimed. With that, if there are no further questions, I yield the balance of my time. Okay, Mr. Pack, you have some rebuttal time. Please proceed. Yes, Your Honor. So, first of all, Jung does not say that, Your Honor. What Jung actually says is that you will be depositing on either a silicon oxide substrate or a different type of substrate. It doesn't talk about having a pure silicon being exposed at the surface, number one. Number two, Your Honor, with respect to this idea that we waived anything, there was no investigation into whether this silicon oxide material that is found at the interface between the first dielectric layer and the substrate, whether that interface is an interfacial film that is created as part of the normal oxygen-based deposition processes or whether it's grown as it was done in the prior art to provide passivation effects. That issue was never addressed, Your Honor, because this case was dismissed after claim construction and doesn't matter under her Honor's construction, which excludes all forms of impurities at the surface, whether it's an intentional layer or not. What we are arguing today, Your Honors, is that the ALJ found that the substrate will consist of impurities and dopants. And in every single instance, including the retala processes, and there are two processes, there's chemical and there's also this thermal processes, you will have silicon dioxide growing back because you either have free-form oxygen, plasma-based oxygen, or metal oxygen sources that are interacting with the silicon substrate. The claim construction basis here excludes impurities that are being formed. And the underlying question of whether the silicon dioxide that we're seeing in the accused products is an intentional layer that was created to provide passivation effects or it is a byproduct of these oxygen deposition processes, that's an issue left for investigation. The case should be remanded based on a claim construction that encompasses a broad understanding of what a substrate can be. Okay, well, hearing no further argument, I thank both counsel for their argument in this case, and the case is taken under submission. The Honorable Court is adjourned from day to day.